The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Marshall Adam WALKER, Defendant–Appellant.

No. 07CA1572.

Colorado Court of Appeals, Div. II.

March 3, 2011.

Rehearing Denied March 31, 2011.

John W. Suthers, Attorney General, Joseph G. Michaels, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Elizabeth Griffin, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge LOEB.

Defendant, Marshall Adam Walker, appeals the judgment of conviction entered upon the trial court's determination, following a bench trial, that he was guilty of thirty counts of sexual exploitation of a child, three counts of unlawful sexual contact, and two counts of enticement of a child. He also appeals the indeterminate sentences imposed on twenty-four of the sexual exploitation counts. We affirm the judgment and the sentences and remand with directions.

## I. Background

Defendant began his teaching career in the fall of 1997 as a student teacher at Bell Middle School in Jefferson County. After one year, he accepted a permanent position as an eighth grade science teacher at Everitt Middle School, also in Jefferson County. At both schools, defendant developed relationships with his students outside of the classroom. He befriended three male students— A.W., T.W., and D.B.—spending time with them after school and inviting them on extra-curricular outings related to his hunting hobby. Ultimately, defendant engaged in inappropriate and unlawful behavior with each of these students, giving rise to the criminal charges in this case.

Evidence at trial showed that A.W. had just turned fourteen years old when he was a student in defendant's class at Bell Middle School. In conversations during class and afterschool help sessions, A.W. learned of defendant's passion for hunting. A.W. became intrigued by the idea of duck hunting, and with defendant's help, A.W. obtained his mother's permission to go duck hunting with defendant. A.W. and defendant went on two or three day trips together during the fall 1997 duck season.

A.W. continued to hunt with defendant the following fall when he was fifteen years old. At defendant's suggestion, A.W. began to spend the night before their hunting trips at defendant's parents' home (where defendant was living at the time) in order to get an early morning start. One night, defendant offered A.W. a handgun if A.W. would allow defendant to photograph him nude. This offer caught A.W. by surprise, and when A.W. asked defendant why he wanted the nude photographs, defendant responded that it was for "blackmail reasons ... to get back at [A.W.] sometime in the future if [he] ever did something." A.W. undressed for defendant, and defendant took at least six photographs in which A.W. was nude and touching himself. However, defendant did not give A.W. the handgun after he posed for the photographs. Rather, defendant told A.W. that he would have to work to get the gun. A.W. declined to pose nude for defendant on a second occasion because he "didn't want the gun bad enough."

T.W. was in defendant's class at Everitt Middle School during the 2002–2003 school year. T.W. often spent time with defendant after school, and they talked about hunting and other extracurricular interests. About two weeks into the school year, defendant offered to take T.W. to a shooting range. Soon after, defendant paid for T.W. to get his hunter's safety license so that they could hunt together. Defendant and T.W. went on at least twenty hunting trips that year, including overnight trips, where defendant provided the equipment and paid the entire cost of the trips. They continued to hunt together the following year after T.W. entered high school, although the trips became less frequent.

On one of their earliest overnight trips, defendant asked T.W. to perform a dare for him. Specifically, he asked T.W. to do ten naked jumping jacks in front of him, explaining that the dare would be T.W.'s "way of paying" for the hunting trips. T.W. initially refused, but after about an hour of arguing with defendant, T.W. eventually relented and performed the jumping jacks.

According to T.W.'s testimony at trial, the dares became routine after this first incident.

Defendant would suggest some kind of dare on nearly every subsequent hunting trip, and would also suggest a dare on other occasions, such as when he invited T.W. to the movies, to Dairy Queen, or to his house to watch wrestling. While the dares constantly changed to correspond to the amount of money spent by defendant, they always involved T.W. removing his clothes for defendant. At trial, T.W. explained that he was asked to pose in various nude positions, to watch pornographic movies, to pose for nude photographs, and to create nude videos. Indeed, police found twenty photographs and two videos of T.W. The videos and photos were admitted into evidence at trial, and the court made the following findings of fact:

> There are two videos ... which contain [T.W.] naked for relatively lengthy periods of time being directed by the defendant of what to do, where to stand, how [to] walk, how to lean over, how to lie down, how to masturbate, whether or not to ejaculate....
>
> In addition, there are photographs ... that show [T.W.] naked in ... to some extent, erotic poses. In any event, sexually explicit naked photographs of [T.W.] ....
>
> In addition, during these photo sessions and video sessions, the defendant would put pornography [on] or have [T.W.] put pornography on the DVD so that that would assist [T.W.] in getting aroused so the defendant could take the videos of [T.W.] while he was aroused and masturbating.

T.W. testified at trial that the dares became such a regular occurrence that defendant would no longer have to ask T.W. to perform them.

D.B., the final student victim in this case, was in defendant's class at Everitt the same year as T.W. Like A.W. and T.W., D.B. would spend time with defendant after school, such as when defendant was grading papers, and they would discuss their interests and hobbies with each other. At one point, D.B. asked defendant if he could go hunting with defendant. Defendant explained that D.B. would first have to obtain a hunter's safety license. Because D.B. was

not interested in undertaking the license certification process, defendant suggested skeet shooting as an alternative activity.

Thereafter, D.B. and defendant made arrangements to go skeet shooting together. They left directly from school one Friday afternoon, first stopping at defendant's parents' house so that defendant could retrieve his guns. They were inside defendant's bedroom when D.B. spotted a pornographic DVD and a deck of playing cards decorated with images of naked women. D.B. casually joked about the DVD and cards, but defendant became noticeably worried and responded that he could not trust D.B. to keep a secret, that he was concerned that D.B. had "dirt on him," and that he could "lose his job." After this brief exchange, D.B. and defendant went to the shooting range as planned.

On the drive home, defendant repeated his concern that D.B. had "dirt on him" and suggested that D.B. pose for nude photographs in return. D.B. refused, but defendant persisted with his request and brought D.B. back to his bedroom. There, defendant first tried to change D.B.'s mind by offering him the deck of playing cards, which D.B. declined. Defendant next offered D.B. a duck call device for use in duck hunting, and D.B. again declined. Finally, defendant offered to change D.B.'s recent test grade from "F" to "B" if he would pose for nude photographs. D.B. agreed at this point because, as he explained at trial, he "needed that grade on that test." Accordingly, D.B. undressed and reclined on the bed for several photographs. Defendant then played a pornographic DVD and asked D.B. to get an erection for more photographs. He repeated this request more than ten times, even offering to give the DVD to D.B. However, D.B. refused, and defendant ceased taking the photographs.

The above incidents between defendant and A.W., T.W., and D.B., respectively, were kept a secret until late April 2006. At that time, D.B. was watching a movie that sparked a repressed memory of defendant taking nude photographs of him. D.B. confided in his father about the photo session and met with a therapist. With D.B.'s consent, the therapist disclosed the incident to authorities.

On May 10, 2006, the prosecution charged defendant with one count of sexual exploitation of a child and one count of enticement of a child in connection with D.B.'s allegations. Numerous counts were then added to the complaint and information as law enforcement officials recovered additional evidence of the various incidents described above as to the three victims. Several counts were also amended or dismissed over time to correspond to the unfolding investigation. Defendant was ultimately charged with thirty counts of sexual exploitation of a child, four counts of unlawful sexual contact, and three counts of enticement of a child.

At a motions hearing one week prior to trial, defendant waived his right to a jury trial, and on February 12, 2007, a two-day trial to the court commenced. At trial, the prosecution presented, among other evidence, the live testimony of A.W., T.W., and D.B., and the various nude photographs and videos that had been recovered of these boys. After a proper advisement, defendant waived his right to testify at trial.

Based on the evidence adduced at trial, the court convicted defendant of thirty counts of sexual exploitation, three counts of unlawful sexual contact, and two counts of enticement. The court then sentenced defendant as follows: (1) four years in prison for each of the six exploitation counts involving A.W.; (2) an indeterminate sentence of twelve years to life in prison for each of the twenty-three exploitation counts involving T.W.; (3) an indeterminate sentence of eight years to life in prison for the one exploitation count involving D.B.; (4) six years in prison for each of the two unlawful sexual contact counts involving T.W.; (5) four years in prison for one unlawful sexual contact count involving D.B.; (6) an indeterminate sentence of six years to life in prison for the one enticement count involving T.W.; and (7) an indeterminate sentence of four years to life in prison for the one enticement count involving D.B. The court ran all sentences for each victim concurrently with one another, and also ordered

the separate sentences as to A.W., T.W., and D.B. to run consecutively.

This appeal followed.

## II. Sufficiency of the Evidence

Defendant contends the evidence was insufficient to support (1) the indeterminate sentences imposed on the twenty-four sexual exploitation convictions involving T.W. and D.B., (2) the unlawful sexual contact convictions, and (3) the enticement convictions. We disagree.

### A. Standard of Review

■ Whether the evidence was sufficient to sustain a conviction is a question of law that we review de novo. *Dempsey v. People,* 117 P.3d 800, 807 (Colo.2005). A reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. *People v. Sprouse,* 983 P.2d 771, 777 (Colo. 1999); *People v. McIntier,* 134 P.3d 467, 471 (Colo.App.2005). The prosecution must be given the benefit of every reasonable inference that might be fairly drawn from the evidence. *McIntier,* 134 P.3d at 471.

The determination of the credibility of the witnesses is solely within the province of the fact finder (here, the trial court), and it is the fact finder's function in a criminal case to consider and determine what weight should be given to all parts of the evidence and to resolve conflicts, testimonial inconsistencies, and disputes in the evidence. *Id.* An appellate court is not permitted to act as a fact finder and set aside a verdict because it might have drawn a different conclusion had it been the trier of fact. *Kogan v. People,* 756 P.2d 945, 950 (Colo.1988); *McIntier,* 134 P.3d at 471–72.

Here, two of the sufficiency of the evidence claims turn upon a question of statutory interpretation. Statutory interpretation is a question subject to de novo review. *Bostelman v. People,* 162 P.3d 686, 689 (Colo.2007).

When interpreting a statute, we must give effect to the intent of the General Assembly, which is vested with the power to define criminal conduct and to establish the legal components of criminal liability. *People v. Hoskay,* 87 P.3d 194, 197–98 (Colo.App.2003). To determine the General Assembly's intent, we look first to the language of the statute itself, giving words and phrases their plain and ordinary meaning. *People v. Rice,* 198 P.3d 1241, 1244 (Colo.App.2008). We read words and phrases in context, and construe them according to their common usage. *Id.* "[W]e must read and consider the statutory scheme as a whole to give consistent, harmonious and sensible effect to all its parts." *People v. Luther,* 58 P.3d 1013, 1015 (Colo. 2002) (quoting *Charnes v. Boom,* 766 P.2d 665, 667 (Colo.1988)). If the statutory language is clear and unambiguous, we do not engage in further statutory analysis and apply the statute as written. *Bostelman,* 162 P.3d at 690; *People v. Witek,* 97 P.3d 240, 243 (Colo.App.2004).

### B. Indeterminate Sentences

Defendant contends the indeterminate sentences on the twenty-four counts of sexual exploitation as to T.W. and D.B. must be vacated and that he must be resentenced with determinate sentences, because the evidence was insufficient to satisfy the applicable indeterminate sentencing statute. Specifically, he contends the prosecution failed to prove beyond a reasonable doubt that there was an "assessment" of him determining that he is "likely to commit" one of the offenses specified in the sexually violent predator (SVP) statute under the circumstances described in the SVP statute, as required by the indeterminate sentencing statute. We disagree.

#### 1. Statutory Framework

Colorado's Sex Offender Lifetime Supervision Act (Act), sections 18–1.3–1001 to –1012, C.R.S.2010, identifies two categories of offenders subject to indeterminate sentencing: (1) sex offenders who have committed one of the sex offenses enumerated in section 18–1.3–1003(5), C.R.S.2010, for whom indeterminate sentencing is mandatory pursuant to section 18–1.3–1004(1)(a), C.R.S.2010; and (2) persons who have committed one of the "so-called economic sex crimes" for whom inde-

terminate sentencing is within the court's discretion under certain circumstances. *See* § 18–1.3–1004(4), C.R.S.2010; *People v. Harrison*, 165 P.3d 859, 860 (Colo.App.2007).

Because the offense at issue here (sexual exploitation of a child) is not one of the enumerated sex offenses subject to mandatory indeterminate sentencing, we concern ourselves only with the discretionary indeterminate sentencing statute, section 18–1.3–1004(4). The indeterminate sentences for the enticement counts are not at issue here, because enticement is one of the offenses subject to mandatory indeterminate sentencing under section 18–1.3–1004(1)(a).

The discretionary statute, section 18–1.3–1004(4), provides in pertinent part as follows:

(a) The court may sentence any person pursuant to the provisions of this section if:

(I) The person is convicted of or pleads guilty or nolo contendere to a crime specified in paragraph (b) of this subsection (4); and

(II) An assessment of the person pursuant to section 16–11.7–104, C.R.S., determines that the person is likely to commit one or more of the offenses specified in section 18–3–414.5(1)(a)(II), under the circumstances described in section 18–3–414.5(1)(a)(III).

(b) The provisions of this subsection (4) shall apply to any person who is convicted of . . .

(II) Sexual exploitation of children, as described in section 18–6–403. . . .

This statute references section 16–11.7–104, C.R.S.2010, which is the requirement for sex offense specific evaluations and which provides that:

On and after January 1, 1994, each sex offender who is to be considered for probation shall be required, as a part of the presentence or probation investigation . . . to submit to an evaluation for treatment, an evaluation for risk, procedures required for monitoring of behavior to protect victims and potential victims, and an identification. . . .

§ 16–11.7–104(1), C.R.S.2010; *see People v. Lenzini*, 986 P.2d 980, 982–83 (Colo.App. 1999).

It also references section 18–3–414.5(1)(a)(II) and (1)(a)(III), C.R.S.2010, which are part of the SVP statute. Section 18–3–414.5(1)(a)(II) lists the offenses that may give rise to an SVP designation, and section 18–3–414.5(1)(a)(III) sets forth one of the four statutory criteria required for an SVP designation, specifically the criterion that the offender's victim "was a stranger to the offender or a person with whom the offender established or promoted a relationship primarily for the purpose of sexual victimization." *See People v. Tixier*, 207 P.3d 844, 846–48 (Colo.App.2008).

Thus, the discretionary indeterminate sentencing statute permits a court to sentence an offender to an indeterminate term only if (1) he or she is convicted of, or pleads guilty or nolo contendere to, an economic sex crime specified in the statute, and (2) an assessment of that offender, pursuant to section 16–11.7–104, determines that he or she is likely to commit an SVP offense against a stranger or against a person with whom a relationship is established or promoted primarily for the purpose of sexual victimization. However, even if these prerequisites are met beyond a reasonable doubt, the decision to impose an indeterminate sentence is committed to the discretion of the court.

## 2. Analysis

In this case, the parties do not dispute the first prong of the statute in section 18–1.3–1004(4)(a)(I) has been met, because sexual exploitation of a child is one of the economic sex crimes eligible for an indeterminate sentence under the discretionary statute. *See* § 18–1.3–1004(4)(b)(II), C.R.S. 2010 (listing sexual exploitation of a child per section 18–6–403, C.R.S.2010). However, defendant contends that the evidence was insufficient to satisfy the second prong of the statute because the prosecution failed to prove there was an assessment required by section 18–1.3–1004(4)(a)(II). Therefore, he argues that the indeterminate sentences on twenty-four of the sexual exploitation counts must be vacated. We are not persuaded.

Prior to sentencing, defendant underwent a mental health sex offense specific evalua-

tion conducted by a Sex Offender Management Board registered sex offender evaluator. The stated purpose of this evaluation was "to access [sic] the nature and scope of any paraphilic behavior exhibited by [defendant]," to identify "any related treatment needs, amenability, and risk factors pertaining to issues of community safety," and to "provide a recommendation regarding [defendant's] receiving an indeterminate or determinate sentence." Thus, the evaluator reviewed the results of defendant's psychological tests, risk assessments, sexual arousal assessment, and clinical interviews, and made the following recommendation:

> It is recommended that [defendant] not be given a community-based sentence, such as probation, as the length, duration, and relationship circumstances of his instant offense behavior, and pedophilic sexual arousal, reflect significant concern. It is recommended that [defendant] be sentenced to the Department of Corrections until such time as significant offense specific treatment goals and objectives have been realized. . . .
>
> Community based [s]ex offense specific treatment is recommended after completion of any Department of Corrections sentence at the discretion of the Court. This conclusion is reached after consideration of the following factors: pedophilic interest per the Penile Plethysmograph, absence of any age appropriate consensual sexual relationship, having only male victims, having unrelated victims, being in a position of trust with the victims of his sexual abuse behavior, and having a history of low motivation for treatment. As such, an indeterminate sentence, such as lifetime probation, is warranted in this case.

The evaluator then attached a "special letter" to defendant's sex offense specific evaluation, in which the evaluator reiterated his recommendation that defendant receive an indeterminate sentence. The letter stated in pertinent part as follows:

> [A] special letter related to the sentencing of [defendant] related to his likelihood of committing Sexual Assault, Unlawful Sexual Contact, Sexual Assault on a Child, and Sexual Assault on a Child by one in a Position of Trust, is being attached to his Mental Health Sex Offense Specific Evaluation for the purpose of sentencing [defendant] to a determinate o[r] indeterminate sentence.
>
> . . . .
>
> It is the opinion of this evaluator, based on research supported risk factors, that [defendant] presents with significant risk to engage in Sexual Assault on a Child and Unlawful Sexual Contact behaviors. He does not meet the criteria to be designated a Sexually Violent Predator. It is the recommendation of this evaluator, based upon the available data, that [defendant] receive an Indeterminate sentence for the purpose of lifetime monitoring, management, and supervision.

The same evaluator also completed a Colorado Sexually Violent Predator Assessment Screening Instrument prior to sentencing. He concluded that defendant did not meet the criteria for an SVP designation because defendant did not score above the threshold level on any of the risk scales or checklists.

At sentencing, the prosecution requested indeterminate sentences on the twenty-four exploitation counts relating to T.W. and D.B. Indeterminate sentences were not applicable to the six exploitation counts involving A.W. because the offenses against A.W. were committed prior to enactment of the Act. Because the trial court found that the special letter attached to the sex offense specific evaluation satisfied the requirements of the indeterminate sentencing statute, the court exercised its discretion to impose the indeterminate sentences.

We conclude the evidence was sufficient to satisfy the requirements of section 18–1.3–1004(4).

First, the sex offense specific evaluation, which evaluated defendant for treatment and risk and which was conducted as part of the presentence investigation, was precisely the "assessment of the person pursuant to section 16–11.7–104, C.R.S." that is required by the discretionary indeterminate sentencing statute. *See Lenzini*, 986 P.2d at 982–83 (section 16–11.7–104 concerns sexoffender-specific evaluations).

Second, the evaluation and the attached special letter satisfied the statutory requirement of an "assessment ... [that] determines that the person is likely to commit one or more of the offenses specified in [the SVP statute]." The letter expressly stated that defendant "presents with significant risk to engage in Sexual Assault on a Child and Unlawful Sexual Contact behaviors." In our view, this statement reflects the evaluator's determination that defendant is likely to commit one of two SVP offenses, which satisfies the statute.

Defendant contends the evaluator's letter does not comply with the statute because it did not expressly opine that defendant was "likely to commit" such offenses. However, we discern no practical difference between the phrases "significant risk to engage in" and "likely to commit" when used, as here, to describe the possibility of defendant committing an SVP offense. Indeed, the word "significant" is commonly defined as "having or likely to have influence or effect," demonstrating that these words may be substituted for one another. *Webster's Third New International Dictionary* 2116 (2002). Also, the evaluator made the statement about defendant's "significant risk to engage in" an SVP offense in direct response to an inquiry about defendant's "likelihood of committing" an SVP offense and about the appropriateness of an indeterminate sentence. This context for the evaluator's statement reinforces our conclusion that the evaluator intended to make a determination that would satisfy the discretionary indeterminate sentencing statute.

Further, the evaluation and special letter provided ample evidence that, if defendant were to commit an SVP offense, it would be "under the circumstances described in section 18–3–414.5(1)(a)(III)"; in other words, defendant would likely commit such an offense against a victim who is a stranger or who is a person with whom a relationship is established or promoted primarily for the purpose of sexual victimization. According to the evaluator's notes in the sex offense specific evaluation, defendant "acknowledges seeking and grooming underage victims for sexual contact" and "befriending [his] victims

with gifts, showing them pornography, and taking ... images of them for his own sexual gratification." *See Tixier,* 207 P.3d at 848 (the phrase "promoted a relationship" as used in the SVP statute includes efforts to encourage a victim with whom the offender has a limited relationship to enter into a broader relationship primarily for the purpose of sexual victimization).

Accordingly, we conclude that the prosecution presented sufficient evidence to satisfy the prerequisites of the discretionary indeterminate sentencing statute.

■ We reject defendant's contention that the word "assessment" as used in section 18–1.3–1004(4)(a)(II), refers exclusively to the SVP assessment screening instrument that is completed pursuant to the SVP statute. By the plain language of the section 18–1.3–1004(4)(a)(II), a discretionary indeterminate sentence is contingent upon an assessment "pursuant to section 16–11.7–104," not an assessment pursuant to the SVP statute, which is section 18–3–414.5. *See People v. Sorrendino,* 37 P.3d 501, 503 (Colo.App.2001) (we do not presume that the legislature used language idly).

Further, to the extent that defendant urges us to rely on *People v. Harrison,* 165 P.3d 859 (Colo.App.2007), for the proposition that the statutorily required "assessment" refers exclusively to an SVP assessment, we decline to do so. In *Harrison,* a division of this court, in summarizing the statutory framework of indeterminate sentencing under section 18–1.3–1004, noted that discretionary sentencing was "also appropriate, but only under certain circumstances (including the need for a sexually violent predator assessment)." *Harrison,* 165 P.3d at 860. However, *Harrison* involved an issue of mandatory indeterminate sentencing rather than discretionary sentencing. Thus, this statement is dicta at best, and it is not at all clear that the division in *Harrison* intended to limit the meaning of "assessment" when it made this ambiguous statement in a single parenthetical in dicta. In any event, we decline to adopt an interpretation of "assessment" that runs counter to the plain language of section 18–1.3–1004(4)(a)(II). *See Bostelman* 162 P.3d at 690 (no further analy-

sis is necessary where statutory language is clear).

We also reject defendant's contention that his SVP assessment screening instrument proves that the indeterminate sentencing statute was not satisfied. According to defendant, his SVP screening instrument is conclusive evidence that he is not likely to commit an SVP offense under the circumstances of that statute. We disagree. At most, the screening instrument shows that defendant scored below the threshold levels on certain risk scales and checklists that were applied to him. And, while this information is used by the court to determine a defendant's status as an SVP, this information does not prevent the court from finding, when there is record support, that the defendant is likely to commit an SVP offense under the circumstances of that statute for the purpose of imposing an indeterminate sentence pursuant to section 18–1.3–1004(4)(a). *Cf. People v. Allen*, 310 P.3d 83, 87 (Colo.App.2010) (a court is not bound by the results of the risk assessment screening instrument where there is other record support for an SVP determination).

Because we conclude that the evidence, when taken as a whole and viewed in the light most favorable to the prosecution, satisfied section 18–1.3–1004(4), *see McIntier*, 134 P.3d at 471, we further conclude that the trial court properly exercised its discretion to sentence defendant to indeterminate sentences on twenty-four of the sexual exploitation counts.

### C. Unlawful Sexual Contact Counts

Defendant contends the evidence was insufficient to convict him of three counts of unlawful sexual contact because the prosecution failed to prove the elements of this offense beyond a reasonable doubt. We disagree.

The prosecution charged defendant with four counts of unlawful sexual contact pursuant to section 18–3–404(1.5), C.R.S.2010, which provides in pertinent part as follows:

Any person who knowingly, with or without sexual contact, induces or coerces a child by any of the means set forth in section 18–3–402 to expose intimate parts ... for the purpose of the actor's own sexual gratification, commits unlawful sexual contact. For the purposes of this subsection (1.5), the term "child" means any person under the age of eighteen years.

Section 18–3–402(1), C.R.S.2010, which defines the offense of sexual assault, sets forth a list of ways by which an actor may commit such an offense. The following subsections on that list are pertinent to the issue before us:

(a) The actor causes submission of the victim by means of sufficient consequence reasonably calculated to cause submission against the victim's will; or

. . . .

(d) At the time of the commission of the act, the victim is less than fifteen years of age and the actor is at least four years older than the victim ...; or

(e) At the time of the commission of the act, the victim is at least fifteen years of age but less than seventeen years of age and the actor is at least ten years older than the victim. . . .

§ 18–3–402(1)(a), (d), (e), C.R.S.2010.

After reviewing the evidence, the trial court convicted defendant of three of the four charged counts of unlawful sexual contact under section 18–3–404(1.5). One count involved D.B. and was based on the nude photo session of D.B. The other two counts involved T.W. and were based on the two videos of T.W. that were recovered and admitted at trial.

On appeal, defendant contends the prosecution failed to prove beyond a reasonable doubt that he induced or coerced D.B. and T.W. to expose themselves "by any of the means set forth in section 18–3–402." We disagree, and conclude that the evidence was more than sufficient to sustain the unlawful sexual contact convictions.

D.B. testified that he did not want to pose for nude photographs for defendant, but that he eventually submitted because defendant offered to raise a recent failing test grade to a B. He further testified that he felt helpless and scared while defendant was taking the

photographs. When asked about defendant's demeanor during this photo session, D.B. responded that defendant appeared "zoned out" and "infatuated ... [and] very intrigued and pleasured by what he was doing." D.B. explained that this was based on "the fact that [defendant] continually asked [D.B.] to get an erection for him, and he was just infatuated and could not take his eyes off with the camera." The testimony at trial also established that this incident occurred sometime during the 2002–2003 school year when D.B. was thirteen years old and defendant was twenty-nine or thirty years old.

T.W. testified that defendant frequently asked him to do dares without his clothing as a way to repay defendant for the hunting trips and related expenses. The dares always changed and roughly corresponded to the amount of money defendant spent. T.W. testified that, although he was hesitant at first, he submitted to the dares because defendant "did have a point [and because T.W. otherwise] wasn't able to pay for any of this stuff." He also testified that he chose to keep the dares a secret because he knew that he "wouldn't be able to go hunting anymore, and [he] really liked hunting." The videos of T.W. represented two of the more elaborate dares that he was asked to undertake. T.W. testified, and the videos confirmed, that defendant would direct him to take various poses and actions on camera, including masturbation, and that defendant would play pornographic material for him. The testimony also established that one of the videos occurred during the 2002–2003 year when T.W. was in the eighth grade and thirteen or fourteen years old and defendant was twenty-nine or thirty years old. The other video occurred during the following school year when T.W. was fourteen or fifteen years old and defendant was thirty or thirty-one years old.

▮ Moreover, there was also ample evidence in the record that defendant engaged in this behavior for his own sexual gratification. We agree with the trial court's findings that, as to D.B., defendant's sexual gratification was proven by the testimony concerning defendant's demeanor during the photo session and by the absence of evidence of any other motivation. We also agree that, as to T.W., defendant's sexual gratification was proven by his verbal directions to T.W. while filming the videos. In addition, when law enforcement officers executed the search warrant in this case, they found one of the videos in defendant's VCR and the other in defendant's closet in a box with various pornographic items. This evidence lends further support to the court's finding that the videos were made for defendant's own sexual gratification, as required by the statute.

Finally, the evidence established that D.B. and T.W. each qualified as a "child" within the meaning of the unlawful sexual contact statute because they were less than eighteen years of age at the time of the photo and video sessions.

Because the prosecution charged defendant under section 18–3–404(1.5), which provides that the offense of unlawful sexual contact may be committed "with or without sexual contact," it is irrelevant that the record is devoid of evidence that defendant actually touched his victims while photographing and filming them.

In our view, the evidence summarized above was sufficient proof of the three counts of unlawful sexual contact because it establishes that defendant knowingly induced or coerced D.B. and T.W. to expose themselves by the means listed in the sexual assault statute for the purpose of his own sexual gratification.

On appeal, defendant contends there was no evidence that he induced or coerced a child to expose himself "by means of sufficient consequence reasonably calculated to cause submission against the victim's will," which is one of the means expressly set forth in section 18–3–402. See § 18–3–402(1)(a). We disagree because there is ample evidence in the record that on each occasion described above, defendant knowingly induced his child victim to expose his intimate parts by a promise "reasonably calculated to cause submission against [that] victim's will." Defendant used his knowledge of D.B.'s and T.W.'s ages, interests, and vulnerabilities to make them promises that would overpower their will and cause them to submit to his requests: for D.B., it was the promise of a test

grade that he desperately needed; for T.W., it was the promise of future hunting trips that he so enjoyed.

Because we conclude there was sufficient evidence that defendant induced D.B. and T.W. to expose themselves by the "means" set forth in section 18–3–402(1)(a), we need not address defendant's arguments concerning the age difference provisions set forth in section 18–3–402(1)(d) and (e).

In sum, viewing the evidence as a whole and in the light most favorable to the prosecution, *see McIntier*, 134 P.3d at 471, we conclude the evidence was sufficient to support the trial court's finding that the prosecution proved beyond a reasonable doubt that defendant committed three counts of unlawful sexual contact as defined by section 18–3–404(1.5).

### D. Enticement Counts

Defendant contends the evidence was insufficient to convict him of two counts of enticement of a child. Specifically, he contends the prosecution failed to prove beyond a reasonable doubt that he acted "with the intent to commit sexual assault or unlawful sexual contact upon said child," as required by the enticement statute, section 18–3–305, C.R.S 2010. We disagree.

The prosecution charged defendant with three counts of enticement of a child. This offense is defined by section 18–3–305(1), C.R.S.2010, which provides in pertinent part as follows:

A person commits the crime of enticement of a child if he or she invites or persuades ... a child under the age of fifteen years to enter any vehicle, building, room, or secluded place with the intent to commit sexual assault or unlawful sexual contact upon said child.

Based upon the evidence presented at trial, the court found that the prosecution had carried its burden of proof as to two of the enticement counts—one count based upon the photographs of D.B., and one count based upon the video of T.W. that was filmed when he was less than fifteen years old—and the court convicted defendant accordingly.

On appeal, defendant contends the enticement statute requires proof of an intent to commit "sexual contact" as that term is defined by section 18–3–401(4), C.R.S.2010. According to defendant, because the prosecution failed to introduce any evidence of his intent to actually touch his victims, to have them touch him, to ask to touch them, or to attempt to touch them, the prosecution did not prove enticement beyond a reasonable doubt. We are not persuaded.

The term "sexual contact" appears in the enticement statute because it is contained within in the phrase "unlawful sexual contact." Defendant urges us to define "sexual contact" as

the knowing touching of the victim's intimate parts by the actor, or of the actor's intimate parts by the victim, or the knowing touching of the clothing covering the immediate area of the victim's or actor's intimate parts if that sexual contact is for the purposes of sexual arousal, gratification, or abuse[,]

which is the definition of "sexual contact" found in section 18–3–401(4). However, we discern no basis for incorporating this definition of "sexual contact" into the enticement statute.

First, this definition of "sexual contact" resides in section 18–3–401, C.R.S.2010. According to the introductory sentence of that section, this definition is reserved for use in part 4 of article 3 of title 18, which covers offenses against the person that relate to unlawful sexual behavior. However, the offense of enticement of a child is not included in part 4. Rather, enticement is found in part 3 of article 3 of title 18, among other offenses against the person that relate to kidnapping.

Second, while section 18–3–401(4) defines "sexual contact," it does not define "unlawful sexual contact," which is the precise language that appears in the enticement statute. Therefore, we question whether the General Assembly intended to incorporate the definition of "sexual contact" into the enticement statute when the terms are not identical.

Third, and most importantly, defendant ignores the plain language of the enticement statute, which requires the act of entic-

ing a child to be performed "with the intent to commit sexual assault or unlawful sexual contact upon said child." § 18–3–305(1). As we read this phrase, the prosecution must prove that a defendant acted with the intent to commit one of two crimes: sexual assault or unlawful sexual contact. *See Luther*, 58 P.3d at 1015 (we read and consider the statutory scheme as a whole in order to give consistent, harmonious, and sensible effect to all of its parts).

This reading is confirmed by a prior version of the enticement statute. Prior to 2000, the enticement statute required proof of an "intent to commit sexual assault in any degree." Ch. 164, sec. 2, § 18–3–305(1), 1985 Colo. Sess. Laws 715. In 2000, the enticement statute was amended to require proof of an "intent to commit sexual assault or unlawful sexual contact." Ch. 171, sec. 48, § 18–3–305(1), 2000 Colo. Sess. Laws 711. This amendment did not substantively change the enticement statute; rather, it merely reflected the changes to the sexual assault offenses that occurred that same year. Specifically, the separate offenses of "sexual assault in the first degree" and "sexual assault in the second degree" were consolidated into a single offense entitled "sexual assault," and the offense of "sexual assault in the third degree" was renamed "unlawful sexual contact." *See* Ch. 171, secs. 18–20, §§ 18–3–402 to –404, 2000 Colo. Sess. Laws 698–701.

■ Therefore, we conclude that "unlawful sexual contact" as used in the enticement statute refers to the offense of unlawful sexual contact (formerly sexual assault in the third degree) as defined in section 18–3–404, not "sexual contact" as defined in section 18–3–401(4). Because we reach this conclusion based upon the clear and unambiguous language of the enticement statute, we reject defendant's request to apply the rule of lenity, which is a rule of last resort. *Cf. People v. Summers*, 208 P.3d 251, 258 (Colo.2009) ("Because we are unable to apply the plain language of the statute and we are unable to discern the legislature's intent behind the statutory language, we reluctantly turn to the rule of lenity—a rule of last resort invoked only 'if after utilizing the various aids

of statutory construction, the General Assembly's intent remains obscured.'" (quoting *People v. Thoro Prods. Co.*, 70 P.3d 1188, 1198 (Colo.2003))).

Accordingly, for the two enticement counts here, the prosecution was not required to prove defendant's intent to touch his victims' intimate parts, or vice versa. The prosecution was only required to prove defendant's intent to commit the offense of unlawful sexual contact, which, as discussed above, may be committed with or without actual touching. *See* § 18–3–404(1.5).

We thus agree with the trial court that the evidence, when taken as a whole and viewed in the light most favorable to the prosecution, was sufficient to support the enticement convictions. *See McIntier*, 134 P.3d at 471. The record shows that D.B. and T.W. were each less than fifteen years old when defendant invited each of them into his bedroom with the intent to commit unlawful sexual contact. Indeed, as discussed in detail above, there was sufficient evidence that defendant actually followed through on his intent and committed the offense of unlawful sexual contact upon each boy. Accordingly, we will not disturb the enticement convictions on appeal.

### III. Amendment of Information

■ Defendant contends the trial court abused its discretion and committed reversible error by permitting the prosecution to amend the six exploitation counts as to A.W. during trial. We disagree.

■ A criminal information serves to advise the defendant of the nature of the charges, to enable the defendant to prepare a defense, and to protect the defendant from further prosecution for the same offense. *People v. Manzanares*, 942 P.2d 1235, 1242 (Colo.App.1996).

■ Under Crim. P. 7(e), a court may permit an information to be amended as to form or substance at any time prior to trial. *See also People v. Al–Yousif*, 206 P.3d 824, 830 (Colo.App.2006). The rule further provides that a court may permit an information to be amended as to form at any time before the verdict or finding if no additional or

different offense is charged, and if the substantial rights of the defendant are not prejudiced. *See* Crim. P. 7(e). In order to determine whether an amendment is one of form or substance, the court must evaluate the count as alleged in the information, as well as the circumstances surrounding the case. *People v. Metcalf,* 926 P.2d 133, 139 (Colo. App.1996) (citing *Cervantes v. People,* 715 P.2d 783 (Colo.1986)).

 Crim. P. 7(e) is to be construed liberally to avoid the dismissal of cases for technical irregularities in an information that can be cured through amendment. *Id.* (citing *People v. Hertz,* 196 Colo. 259, 586 P.2d 5 (1978)).

 Because the decision to allow an information to be amended pursuant to Crim. P. 7(e) is committed to the discretion of the trial court, we will not overturn a court's decision absent an abuse of discretion. *Al–Yousif,* 206 P.3d at 830.

In order to assess defendant's contention that the six exploitation counts as to A.W. (counts seven through twelve) were prejudicially amended during trial, we must first track the evolution of these counts prior to trial.

As initially charged, counts seven through twelve alleged that defendant committed sexual exploitation of an unidentified male child on or about January 1, 2003 through May 5, 2006.

Approximately six months prior to trial, the prosecution moved to amend the dates in counts seven through twelve in order to reflect the unfolding investigation. Specifically, the prosecution moved to amend the dates to a six-year period between January 1, 1998 and December 31, 2003. The court granted the prosecution's motion to amend nunc pro tunc at a preliminary hearing conducted one month prior to trial. Evidence adduced at the preliminary hearing also established that A.W. was the victim previously unidentified in counts seven through twelve, and those counts were subsequently amended to confirm that identification.

In January 2007, the prosecution moved again to amend the dates in counts seven through twelve to narrow them to a thirteen-month period of time between August 1, 1997 and August 28, 1998. The court granted this second motion to amend one week prior to trial.

On the morning of trial, the prosecution moved to amend the dates in these counts for a third time, to expand them by one year. Specifically, the prosecution moved to amend the dates to an approximately two-year period between August 1, 1997 and August 28, 1999. When defense counsel was asked whether he had any objection to this motion to amend the dates, he made the following remarks:

> [I]n terms of 7 through 12, because there's an extra year time frame that's added to each of those counts, and because of that, that's prejudicial. I've got to figure this out. I can't do this the day of trial. I'm sorry, I can't do it.

The court then granted this third and final motion to amend the dates after opening statements, but prior to the first witness. The court found as follows:

> Under the circumstances here, I don't think the defendant's prejudiced by the fact that for one week during the pendency of this case the dates of violation on those Counts 7 through 12 were identified as being from August of '97 to August of '98 when throughout the . . . remaining pendency of this case, the time periods varied from seven years to two years. So under the circumstances, I'm going to grant the motion.

At trial, A.W. testified that defendant photographed him naked on one occasion in the fall of 1998 when he spent the night at defendant's house prior to a hunting trip. A.W. was fifteen years old at the time. The testimony surrounding the photographs taken during this incident provided the factual basis for the trial court's finding that defendant was guilty of exploitation under counts seven through twelve.

On appeal, defendant contends the final amendment that occurred the morning of trial was prejudicial error, and that if counts seven through twelve had not been so amended to include the fall of 1998, not guilty

verdicts on those counts would have been required. We discern no basis for reversal.

The amendment did not cause defendant to be charged with an additional or different offense. Both before and after the amendment, he was charged with six counts of sexual exploitation of a child. Nor did this amendment go to the essence of the charges, because a change in the date of an offense is a matter of form, especially where, as here, the limitations period has not yet run. *See, e.g., Albritton v. People,* 157 Colo. 518, 520, 403 P.2d 772, 773 (1965); *cf. People v. Adler,* 629 P.2d 569, 571 (Colo.1981) (a variance between the date as alleged in the information and the date as proved at trial is not fatal); *Marn v. People,* 175 Colo. 242, 247–48, 486 P.2d 424, 427 (1971) (same).

Moreover, as the trial court found, defendant was not prejudiced by this amendment. From the time counts seven through twelve were originally charged, defendant was on notice that these counts were based on six specific nude photographs recovered from his house. As such, the amendment did not create unfair surprise or hinder his ability to prepare a defense as to these charges. Also, as the trial court properly observed, the dates in these counts were only narrowed to a thirteen-month period ending in August 1998 for one week out of the entire pendency of this case. Thus, prior to trial, with the exception of one week, defendant was on notice that counts seven through twelve were based on a six-year window of time that included the fall of 1998 (which is when the photo session of A.W. occurred based on the evidence presented at trial).

Under these circumstances, we conclude that the trial court did not err by permitting the prosecution to amend the dates in counts seven through twelve on the morning of trial. *See* Crim. P. 7(e); *Al–Yousif,* 206 P.3d at 830.

## IV. Waiver of Jury Trial

Prior to trial, defendant waived his right to trial by jury, and he now contends on appeal that the waiver was not made voluntarily, knowingly, and intelligently. He further contends that because the waiver was invalid,

a retrial is necessary as to any counts for which the prosecution presented sufficient evidence. Because we are without a factual basis to review the validity of the jury trial waiver in this case, we remand for a postconviction evidentiary hearing as set out more fully below.

Whether the waiver of a constitutional right is voluntary, knowing, and intelligent presents a mixed question of law and fact. *People v. Montoya,* 251 P.3d 35, 39 (Colo.App.2010). Thus, we review a court's factual findings underlying its determination of the validity of the waiver for clear error, but we review the court's ultimate conclusion as to the validity of the waiver, which is a question of law, de novo. *Id.* When reviewing the validity of a defendant's waiver of his or her constitutional right to a jury trial, we look at the advisement and weigh the totality of the circumstances. *Id.* Whether there was a valid waiver of a jury trial by an accused depends on the unique circumstances of each case. *Id.* at 40.

Where, as here, an issue is not brought to the trial court's attention by a contemporaneous objection, we review only for plain error. Crim. P. 52(b); *People v. Miller,* 113 P.3d 743, 749 (Colo.2005). Plain error is obvious and substantial error that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Miller,* 113 P.3d at 750.

The right to trial by a jury in criminal cases is guaranteed by the United States and Colorado Constitutions. U.S. Const. amend. VI; Colo. Const. art. II, § 23; *see also People v. Norman,* 703 P.2d 1261, 1271 (Colo. 1985). It is "one of those primary personal rights fundamental to our system of government." *Norman,* 703 P.2d at 1271; *see also Montoya,* 251 P.3d at 40 (the right to a jury is fundamental and considered one of the most important in our democracy).

Nevertheless, a defendant in a criminal case may elect to waive the right to a jury trial. *Norman,* 703 P.2d at 1271. The only constitutional requirement is that the jury trial waiver be made voluntarily, know-

ingly, and intelligently. *Montoya,* 251 P.3d at 40 (citing *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). A defendant must personally waive his or her right to a jury trial, and a statement by defense counsel does not operate as a waiver. *People v. Laeke,* 280 P.3d 1, 5 (Colo.App.2009) (*cert. granted* Sept. 13, 2010). In Colorado, a colloquy, which is not constitutionally required, serves as a "procedural device" that assists the court in resolving the constitutional issue of whether a jury trial waiver is made voluntarily, knowingly, and intelligently. *Montoya,* 251 P.3d at 40; *see People v. Thompson,* 121 P.3d 273, 276 (Colo. App.2005) (extensive, on-the-record advisements are not constitutionally required for an effective jury trial waiver).

Crim. P. 23(a)(5) was amended by the Colorado Supreme Court, effective January 1, 2007, in part "to require that trial courts conduct on-the-record advisements to defendants informing them of specific elements of their right to a trial by jury and of certain consequences if they waive that right." *Montoya,* 251 P.3d at 43 (discussing the circumstances surrounding the amendment to the rule governing waiver of jury trial).

As amended, Crim. P. 23(a)(5) provides:

(I) The person accused of a felony or misdemeanor may, with the consent of the prosecution, waive a trial by jury in writing or orally in court. Trial shall then be to the court.

(II) The court shall not proceed with a trial to the court after waiver of jury trial without first determining:

 (a) That the defendant's waiver is voluntary;

 (b) That the defendant understands that:

 (i) The waiver would apply to all issues that might otherwise need to be determined by a jury including those issues requiring factual findings at sentencing;

 (ii) The jury would be composed of a certain number of people;

 (iii) A jury verdict must be unanimous;

 (iv) In a trial to the court, the judge alone would decide the verdict;

 (v) The choice to waive a jury trial is the defendant's alone and may be made contrary to counsel's advice.

The amended rule was in effect at the time of defendant's waiver in this case, which occurred at a preliminary hearing conducted on February 5, 2007. Defense counsel informed the court of defendant's desire to waive his right to a jury trial, and the following exchange took place:

The Court: And, Mr. Walker, you understand you have the right to a jury trial?

Defendant: That's correct.

The Court: And that you also have the right to waive a jury trial, you understand that?

Defendant: That's correct.

The Court: And here your attorney is representing that you wish to waive a jury trial; is that correct?

Defendant: That is correct.

The Court: Are you under the influence of any drugs, alcohol, or medications?

Defendant: No, I'm not.

The Court: Have you been forced or coerced to waive a jury trial in this case in any way?

Defendant: No, I have not.

The Court: The Court finds the defendant has entered a knowing and intelligent waiver of his right to jury trial, and the matter will be heard by the Court.

We agree with defendant's contention that this advisement did not substantially comply with the requirements set forth in Crim. P. 23(a)(5)(II)(b)(i)–(v), which was in effect at the time of defendant's purported waiver. Here, as in *Montoya,* the error was "clearcut and obvious, and could easily have been avoided by consulting the text of the amended rule." *Montoya,* 251 P.3d at 43. Accordingly, the error is plain, and we next consider the appropriate remedy for this error.

We disagree with defendant that a retrial is automatically required on all counts for which the prosecution presented sufficient evidence. As the division stated in

*Montoya*, while the amended rule "serves the important purposes of ensuring that a defendant is informed of his or her right to a jury trial and creating a clear record with respect to any waiver," there is no constitutional right to any particular colloquy, and therefore, "a violation of the rule requiring an advisement or colloquy does not, in and of itself, mean there has been a deprivation of the constitutional right to a jury trial." *Montoya*, 251 P.3d at 40. Thus, we decline to grant defendant's request for the reversal of his convictions and for a new trial before a jury. *See id.*

We find *Montoya* persuasive on the issue of the remedy for a deficient advisement. On facts very similar to those present here, the division in *Montoya* held that the validity of a jury trial waiver should be resolved in a postconviction evidentiary hearing where a full record could be developed. Thus, the division stated that:

> Before the trial court can find a defendant's waiver of the right to a jury trial was constitutionally invalid and warrants a new trial, the defendant must establish prejudice by showing that (1) if there had been a proper advisement, he would not have waived the jury; and (2) therefore, the deficient advisement resulted in a waiver that was not made knowingly, voluntarily, or intelligently.

*Id.* (citing *Thompson*, 121 P.3d at 275).

We have concluded that the trial court did not substantially comply with Crim. P. 23(a)(5). We have also reviewed the record, and we conclude, as was the case in *Montoya*, that it does not contain a full factual basis upon which to review the validity of defendant's jury trial waiver or to assess whether defendant suffered substantial prejudice as a result of the deficiency. Therefore, consistent with *Montoya*, we remand the case to the trial court with directions to conduct an evidentiary hearing to resolve the issue of the validity of defendant's jury trial waiver. *See id.* ("The evidentiary hearing on remand will have the same effect as a hearing on a postconviction motion filed pursuant to Crim. P. 35(c)."). If the trial court determines that the jury trial waiver was valid, the court's ruling in that postconviction proceeding will

be subject to appellate review. If the trial court determines on remand that defendant did not validly waive his jury trial right, then the parties should brief and the trial court should address the issue of the appropriate remedy.

## V. Indeterminate Sentences

In addition to the sufficiency of the evidence claims discussed in Section II, defendant makes two further contentions regarding the indeterminate sentences imposed on the twenty-four sexual exploitation counts as to T.W. and D.B. First, he contends the trial court erred by imposing indeterminate sentences because they were not actually charged in the information as sentence enhancers. Therefore, he contends the sentences must be vacated and replaced by determinate sentences. Alternately, he contends the sentences must be vacated because he did not voluntarily, knowingly, and intelligently waive his right to have a jury find the facts required for discretionary indeterminate sentencing. We consider each contention in turn.

### A. Information

■■■■ The sufficiency of an information is a question of law that we review de novo. *People v. Melillo*, 25 P.3d 769, 777 (Colo. 2001).

Because defendant did not object to the sufficiency of the information in the trial court, we review his claim regarding the alleged lack of notice of the indeterminate sentences for plain error. *See* Crim. P. 52(b); *Miller*, 113 P.3d at 749. Plain error is error that is obvious and substantial and that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Miller*, 113 P.3d at 750.

An information is sufficient if it can be understood therefrom that the person who signed it had the authority to do so, that the defendant is named or described, that the offense was committed within the jurisdiction of the court or is triable therein, and that the offense charged is described in enough detail and with such a degree of certainty for the

court to pronounce judgment upon a conviction. *People v. Joseph,* 920 P.2d 850, 852 (Colo.App.1995); *see also* Crim. P. 7(b)(2).

The supreme court has identified two fundamental objectives that an information must serve, stating that "[a] charge is sufficient if it alleges sufficient facts to permit the accused to prepare an adequate defense and to assure that the defendant cannot be prosecuted again for the same crime." *Melillo,* 25 P.3d at 778 (quoting *People v. Chavez,* 730 P.2d 321, 325 (Colo.1986)) (explaining also that Colorado follows the modern trend of testing the sufficiency of the information based upon the fundamental objectives served by the information rather than the technical pleading requirements of the common law).

■■■ Thus, an information is sufficient if it identifies the essential elements of the crime charged. *Id.* Further, defects in the form of the information that do not substantially prejudice the rights of a defendant do not render an information void. *Joseph,* 920 P.2d at 853 (listing examples of defects as to form that do not render an information void, including the addition of a sentence enhancement allegation).

Applying the above legal principles, we question whether the prosecution's failure to charge indeterminate sentencing as part of the applicable exploitation counts in the information was error at all, given that the basic requirements of Crim. P. 7(b)(2) were met and that the information identified the essential elements of the offense of sexual exploitation of a child. *See Melillo,* 25 P.3d at 778.

In any event, we conclude that the failure to charge the indeterminate sentences in the information does not constitute plain error requiring these sentences to be vacated and replaced with determinate sentences. Defendant was on notice that he was being charged with multiple counts of sexual exploitation of a child. Thus, we presume that he was aware of the law in Colorado, specifically that sexual exploitation of a child is an offense that is subject to discretionary indeterminate sentencing, pursuant to section 18–1.3–1004(4). *See People v. Carey,* 198 P.3d 1223, 1231 (Colo.App.2008); *People v. Hay-*

*ward,* 55 P.3d 803, 806 (Colo.App.2002). Further, as noted, defendant did not make a contemporaneous objection at sentencing. Nor did he claim surprise in response to the prosecution's request for the indeterminate sentences. To the contrary, the record shows that defendant acknowledged the correctness of the presentence report, which included a recommendation for the indeterminate sentences. Under these circumstances, we conclude there was no plain error. *See Miller,* 113 P.3d at 750.

## B. Jury Trial Waiver

■■■ Defendant alternately contends the indeterminate sentences must be vacated because he did not voluntarily, knowingly, and intelligently waive his right to have a jury find the facts required to impose such sentences on the exploitation counts.

We agree with defendant that, absent a valid jury trial waiver, he was entitled to have a jury find the additional facts required by the discretionary indeterminate sentencing statute. *See People v. Isaacks,* 133 P.3d 1190, 1193–94 (Colo.2006) (citing *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)).

We have already concluded that we are unable to assess the validity of the jury trial waiver in this case and that an evidentiary hearing is necessary on remand to determine that issue. Therefore, the resolution of this contention concerning the indeterminate sentences turns upon the outcome of that evidentiary hearing. If the trial court determines that the jury trial waiver was valid, it follows that defendant voluntarily, knowingly, and intelligently waived his right under *Isaacks* and *Blakely* to have a jury find the additional facts required under section 18–1.3–1004(4). If the trial court determines on remand that defendant did not validly waive his jury trial right, then, as discussed above, the parties should brief and the trial court should address the issue of the appropriate remedy.

## VI. Mittimus Errors

Defendant contends, the People concede, and we agree that the trial court erred by

misstating two counts on the mittimus (counts six and fifty-three). While the court properly imposed a sentence of six years in prison for count six, which was one of the unlawful sexual contact counts involving T.W., the mittimus erroneously reflects an indeterminate sentence of six years to life in prison. As to count fifty-three, which is the other unlawful sexual contact count involving T.W., the mittimus erroneously reflects the offense of sexual assault. We, therefore, conclude that the mittimus errors as to counts six and fifty-three must be corrected.

The case is remanded to the district court for further proceedings consistent with this opinion on the validity of defendant's waiver of his jury trial right and for correction of the mittimus. In all other respects, the judgment and sentences are affirmed.

Judge CASEBOLT and Judge FOX concur.